Good morning, Your Honors, and may it please the Court, my name is Gregory Podolak and I represent the appellant, Herman's Real Estate Ventures, LLC, in this matter, and we're asking the Court today to reverse the decision of the District Court, and in so doing, grant summary judgment to the appellants on the issue of the duty to defend and remand for further proceedings as to the settlement, Copland's duty to indemnify issues. I have a question I want to ask both of you, several questions I want to ask both of you. One is, truth be told, I had my law clerks look very hard for a Copland's case, Copland's issue case, where there was an agreement in the settlement to cooperate or make nice for criminal charge purposes. I couldn't find one. Are you aware of any? I'm not, Your Honor. Did you look? I'd like to be able to say that counsel and the Court looked hard and couldn't find one. We did look hard. Yeah. We looked extensively. I'm not aware of a case with that specific set of circumstances, no. That to me is something of a difficult issue, and it's, of course, a difficult issue of have the insured saying, look, I don't want to go to jail. That's my number one priority, and the plaintiff's saying, well, let's talk about that. The state's attorney's already involved because the plaintiff went to the state's attorney first, and you've got those charges. They're worth something. Something gets traded in return for the cooperation, and I know the lawyers were careful, not just because of Copland's implications, but also compounding felony implications, and the negotiations were we'll need to consult a real good criminal defense lawyer about that. I understand all that, but the question I have in my mind is does that make the whole settlement bad faith under Copland's because it was negotiated? Part of the consideration was to make nice on the criminal charges, and I believe the testimony was if asked, I would even recommend that he not be prosecuted. The words to that effect in the actual testimony, am I wrong about that? No, I believe that characterization is accurate reflection of the record. So, why shouldn't that be bad faith? Because it is a totality of the circumstances consideration, and I would, I think, back up to say that, of course, the context here is that the reasonableness questions, the are inherently factual issues, and so the record also reflects that there is a litany of detailed analysis about the nature, scope, and extent of the mismanagement of this particular grove and the liability that would be associated with that and the potential for a runaway verdict. So, that, the elements that the court is raising certainly are an issue in the record, but there are other elements, too, and this case has never been, had the opportunity to be jury or to a bench. Those issues were all decided on summary judgment without the opportunity to consider the evidence and weigh and balance the sufficiency of that testimony. Yet, there have been judgments as a matter of law ruling out Koblentz's liability, have there not? There have, but in entirely extreme circumstances. The probably most prominent case that's featured by travelers in this scenario actually was a case that went to a bench trial. Forgive me, Your Honor, I want to make sure that I make accurate reference to it. The Sidman decision, and forgive me that I forget, neglect the full name of the citation, but it's supported and it's discussed in the brief, but I think an important point of that, and that is one that travelers leans on heavily to try and draw comparisons about the nature of the negotiations of the underlying case and this, and it shouldn't be lost on this court that that decision was a review on a clearly erroneous standard of a bench trial evaluating all of that evidence as it was presented. We haven't had that opportunity here, and there is a plethora of evidence why this was a reasonable settlement and negotiated in good faith by the lawyers who actually are in the courtroom today. Yeah, I'm not sure I want to be candid with you. Florida law, I'll do my best to follow it, but I don't really understand how you to determine good faith and bad faith when the insured has no reason not to agree to any amount. If the plaintiff had come up and said, agree to $20 million in this case, and I'll give you a release, hold harmless, whatever, and the insured had said, that'll screw the couple, don't worry about it, that's what I want to do, I don't have any doubt in my mind he would have said, what's he going to say? No, I want to be fair to travelers. I just couldn't sleep with myself if I did anything to jeopardize that multi-billion dollar life insurance company or insurance company of all kinds, carriers. I don't understand, I also don't understand unreasonable or bad faith. How can a reasonable, objectively reasonable settlement, whatever that means in this unequal situation, be in bad faith? And if reasonable people could have reached that settlement, why does it get skewed because somebody didn't know that and bad faith entered it? I don't understand the whole deal, and I don't want to take up your time about it. Well no, and I think Your Honor is hitting on precisely the point why this is not the type of case that gets decided on summary judgment. And the issues of the compartmentalized, somewhat compartmentalized issues of reasonableness and bad faith, I would agree that they wind up in most circumstances getting intertwined here. And I think the evidence does show that, and Your Honor is fundamentally I think asking a question about intent at the end of the day, which is yet another critical aspect of why this actually gets an opportunity for a trial, because there is conflicting evidence about what the motivations were, what was driving the assessment of the case, the decisions of the counsel that were advising the parties. And there is a litany of evidence that says this was a reasonable decision, and that's compounded by not only the evaluations that were done at the time, of course, but subsequent analyses of that same data, which confirm that the exposure here, including analyses performed by travelers, confirm that the exposure here was in the multimillion dollar range. So for someone like McKenzie, who is effectively, though not legally, a sole proprietor, the risk of proceeding to a trial and an exorbitant jury verdict in a South Florida, before a South Florida jury, is enough motivation to say, I don't really have any options. My carrier, who should have provided me a defense in this case under this policy that I specifically purchased to provide me liability coverage for my farming operations, has left me in the lurch. I now have to deal with the resources that are available to me, which are minute, and cut the best deal that I can, which is inclusive of the $200,000 settlement that was reached on the other components of the suit. So it's not as if McKenzie, in this case, has effectively thrown his hands up and said, I'll, you know, feed travelers to the wolves. He had his own stake. He had his own exposure. He negotiated the best deal that he could. And that's all evidence that should wind up being presented to a jury. But isn't it true, I thought it was, that, or maybe it's just, it can both be true and in the red brief, but I thought it was that you didn't challenge it in a great, Wadaway did not bother to investigate Herman's loss amount or to scrutinize the opinion of Herman's expert. Is that not true? That is not true. What he did was he evaluated based on his, he did multiple things. He evaluated the exposure of an adverse jury award based on his 20 plus years of experience litigating in that South Florida market. He consulted his client, who has experience in this particular field, and that client testified both in the underlying case and in this case extensively about his evaluation of those numbers and was concerned that the initial projection that was provided would be low. And the subsequent analysis of that initial projection has borne that out to be true. I do want to address, this is fundamentally a coverage case, and I think it's critical to talk about the farm caretaking endorsement, which is really the cornerstone of the analysis that this court is being asked to undertake and recognize that this is an endorsement which I think to this point has essentially been trod over both by travelers and I think in the underlying analysis provided by the district court. But it fundamentally changes the nature of this liability policy. So this is a, this court will be familiar with the post-1986 insurance service office standard commercial general liability policy. And that is the foundation of the product that McKenzie purchased. The insuring agreement, which establishes the coverage that that policy provides, essentially provides liability coverage for damages because of property damage. That's very basic language, it's been interpreted by courts ad infinitum since it's been a standard product in these markets. What McKenzie purchased here was an endorsement that added onto the policy, restructured that insuring agreement to extend coverage, very specifically extend coverage to farming operations. And so that changes the fabric of what this policy is designed to do from the outset. And it's critical both in assessing the issue of the duty to defend and coverage for the subsequent settlement. The allegations that, looking at the duty to defend specifically, where the law says the analysis is restricted to the four corners of the allegations and the four corners of the policy. The allegations against here in the amended complaint against McKenzie in count four dealing with negligence issues were specific about the idea that his mismanagement of this grove caused physical injury and loss of use, which is an alternate definition of property damage under this policy, caused physical injury and loss of use to the grove that he was managing. This is, the language in the endorsement is explicit. And I think that the challenge up to this point is that Traveler's position about the application of the J-5 exclusion necessarily requires this court to accept a direct conflict because the exclusion is compartmentalized only to apply to the specific piece of real property on which the insured is performing operations at the time the property damage happens. And so to take the, to reach the conclusion that that exclusion somehow swallows up everything that McKenzie was doing in this case, whether you're looking at... But McKenzie was performing duties on the entire grove. Absolutely he was. And that's specifically why he purchased this endorsement that says your coverage is extended to those farming operations. The property damage liability coverage is extended to those farming operations. And so when you look at the allegations against him and focusing specifically in on the duty to defend issues for just a moment, the legal threshold is if there's any potential, looking exclusively at those two documents, that there could be coverage. Your Honors, I see my time has expired, if I might just briefly conclude that thought. If there is any potential for coverage for the facts that are ultimately born to be true, and I think it's important to remember that we look only at those documents and not the time. The duty to defend is very specific. If you look at those two pieces, if there is any possibility that the evidence that's ultimately developed could trigger that coverage, Travelers has to provide a defense. That was the standard here and they didn't meet that standard. Isn't it true that the negligence claim didn't come into the case until after the plaintiff discovered that the defendant had an insurance policy? That's true. And I think that's a common litigation practice that there's discovery sought about available insurance and ultimately the legal analysis, again, doesn't take that into account. The question simply is, looking at the allegations as pled, is there any potential that those allegations have proven to be true and the facts ultimately developed could trigger coverage? You have to provide a defense. This is commonly known as litigation insurance for that purpose. It is the central feature of what this kind of insurance is designed to provide so that litigants are not left having to fund their own defense. If there's any question, you err in favor of the defense. Okay, thank you. May it please the court, Sina Bahadurin here on behalf of Applee Travelers Indemnity. If I could start, I'd ask the court to consider this, if you were to do anything other than affirm the district court's decision, consider the message that it would send to insurance litigants in Florida. You can criminally pursue someone, you can provide such compelling evidence that the state attorney's office backs you, actually charges the insured with a scheme to defraud as well as grand theft. Then what you do is you team up with the insured, you swap jail time for a $3 million settlement, and then you utilize the legal process to dump it all on the insurance company. But you can make the same argument about covalence agreements that don't involve cooperation in criminal matters. That's right, Your Honor, and you asked some very astute questions I don't think you got great answers to as to whether or not anywhere in the country there's ever been a covalence agreement. These exist in various iterations across the country. I can represent to the court that we have never, ever seen it in our experience doing this across the country, nor have we found any case where there's been a swap of jail time for money. You asked, what is it about a covalence agreement? What is it about this issue of bad faith? Of course, their position is it's a factual issue whether there's a swap of criminal exposure for money. They're saying, oh, that was just the restitution amounts he's got to make, quote, unquote, on restitution. Yeah, and for that, we simply need to look at the record, and you touched on this, Your Honor. So, built into the settlement agreement, and again, I can represent to the court that no case has ever had this fact where the actual insured's defense attorney builds a declaration into the counter-draft of the settlement agreement, which says that we have made no independent investigation relating to the amount of alleged damages, and we're relying solely on the plaintiff, Herman, for investigation representation with regard to the calculation. The other thing that he did ask for was the quid pro quo. Is there any, the clause before the quid pro quo, is that unusual in a covalence agreement? Yes. That is the definition of collusion, because the case law says, what is collusion? Collusion is you not attempting to mitigate your liability in any way. You cannot- That's why I'm asking. Yeah. I don't, you took depositions. Was there any indication of why that was included? Because it was the truth. He conducted no investigation. We're sophisticated folks here. Yeah. Lawyers don't say, we need to include these damning facts because they're the truth. Yeah. At least if they're damning their client's position. Why would he have put that in there? No explanation. No explanation to deposition? No, Your Honor. There was no explanation for that. There was no explanation as to why it is that after the insured had been charged criminally, you had this amended complaint for negligence. There was no new facts. There was no new evidence. He's saying that the amended complaint for negligence was, well, everything in the civil suit was after he was charged criminally. Correct. Criminal charges, or at least he went to the state's attorney first. But he's saying that the critical part of the chronology is we found out he had an insurance policy and we added the negligence complaint to make sure that we had all the claims covered. That's right. We were going to call the same allegations that we were prosecuting criminally, we were going to now use the label negligence as if that somehow transforms everything that had transpired. The other thing that I would mention to the Court is, let's keep in mind how the negotiations transgressed. Counts 1, 2, and 3, which included a claim for lost profits, were ultimately settled down from $400,000 to $200,000. When it comes to count 4, right, this is the setup. It actually starts off at $1.5 million and it ends up at almost $3 million. So that, again, if we look at the record evidence, it is the antithesis of any attempt at mitigating liability. It is doing everything you can because he was, the record is clear about this, defense counsel was asked, what was your primary goal? My primary goal was to keep my client out of jail. That's all that mattered to me. That under Florida law is the definition of collusion. The other issue that the... But so we do have a negligence claim and we do have an insurance policy. So under your argument, we should just be reading the negligence count out of the complaint? No, no. I think that the fact that we're dealing with the consent judgment, we should put the amendment in the context of everything that's transpired because we didn't have an honest process. We had a amended complaint that followed all kinds of criminal allegations, criminal charges, things like that. And then the process was usurped from playing itself out because all those rights were assigned to the plaintiff. So it's not a traditional pleading situation. But even if we indulge this argument... But even in any kind of covalent situation where there are no criminal charges, arguing collusion in the settlement is not an atypical approach. Why does this not just all go to the jury? Well because that's the court's process, is to evaluate whether or not a reasonable try or a fact could find, contrary to what defense counsel's testimony was, contrary to what was actually built into the drafts of the settlement agreement, that somehow this was an honest process. And there, you know, scintilla of evidence is not sufficient. No reasonable trier could have concluded differently. Let me tell you what Mr. Podolak or whoever, if this goes to a trial, is going to explain to the jury that the sentence you referred to or the disavowal you referred to in the agreement, what was motivated. What motivated that? He's going to say the reason Mr. McKenzie said, this is the damages his expert says, I haven't checked them out, basically I take no position on them, even though I'm signing off on them, is in case the state's attorney said, well thank you Mr. Hermans, but we're going to prosecute Mr. McKenzie anyway. And he gets into the amount of loss and the fraud. McKenzie can then contest the amount, whereas if he signs on the dotted line that that's an accurate amount of loss that he's caused, he won't be able to do that in the Grimble case. That's why that's in there. And that's a reasonable inference. The only thing I would suggest though is even if we indulge that inference, there is still no record evidence of any attempt to mitigate liability whatsoever. You have to do that as part of your due diligence if you are a plaintiff and you are trying to erect a consent judgment. Your Honor asked about, well if I'm an insured, why would I want to do anything? I would submit that you wouldn't, but you are then creating a consent judgment that the legal system is not going to enforce. And that's what we're talking about here. And it's not just the issue of collusion. There's a second prong, which is reasonableness. There's ample record evidence that there was no consideration whatsoever for the costs to generate the quote-unquote lost profits that they were seeking. No consideration whatsoever that the average is anywhere from $1,200 to $2,000 an acre. If we use $2,000 an acre, the Grove would have operated at a loss. If we say $1,200 an acre, it would have ended up at roughly $1.4 million, which is half of the $3 million consent judgment. It is per se unreasonable for that amount. There was no consideration of a present money factor in terms of anywhere between 10 to 12%. The expert testimony, the one that the entire consent judgment was built around, testified that citrus greening devastated, his word, devastated the entire industry. That was not considered at all. He also testified that the ultimate reason why the Grove failed was because of greening, not all of this fraud and everything else that was going on at the time. And then the last thing is on the issue of lost profits. So back to the pleading. If you look at all four accounts, each of them in the Ad Damnum Clause mentions lost profits. Well, we know that all of the lost profits were dumped on count four. If we look at what he had been criminally charged with, it was roughly 57% of the trees that were negligently affected, and then 43% that were stolen. Well, he settled 43% of the trees for $200,000, and then the other 57% that was negligently grown or whatever else, turns into a $3 million lost profit claim. When asked to explain why, no record evidence to offer a credible explanation. The final thing I want to touch on, because much has been made of this, is this amendment and what do we do with it. If you look at count four, and we start off by looking at it in isolation, there are no dates in it whatsoever. Well, if you look at the insuring agreement of the policy, you have to have property damage during the policy period. You can't have dates in the abstract. So necessarily, that requires us to look at counts one, two, and three to understand what period of time are we even talking about, because travelers went off the risk in 2013. Once you start to look at counts one, two, and three, which I understand that appellants have conceded is not covered, then you start to see the full story of what happened here. So in count one, you had allegation of immature and under-planted groves. You had allegations of conversion of fuel, trees, as well as other material. And then what happens is by the time you get to count four, to put that all in context, you start seeing arguments that, well, we understand that counts one, two, and three are actually for theft, and count four is dependent on counts one, two, and three as to timing. But somehow, count four lives independently, and it's actually for negligence. It's actually for property damage. And this was a dilemma that you could see play out in the brief. My favorite passage was, stealing money, regardless of whether it was by means of overcharging or underperformed services or otherwise, does not inherently or necessarily cause property damage to a grove. So in other words, we're trying to stay away from intentionality, no occurrence, things like that, and to do so, we're trying to say that there's no property damage. But by the time we get to count four, lo and behold, because we use the negligence label, it is actually property damage. I would ask the court to closely scrutinize the anatomy of count four. There is no allegation of property damage. It's economic damages. You weren't performing. Why is it that the pumps and the irrigation system wasn't functioning properly? We know from counts one, two, and three, it's because he was diverting fuel. Why were the trees thinly planted? Because he was charging for trees, but not actually planting them on the plaintiff's grove. He was planting it elsewhere. So that's where you start to see everything come together. The other issue is J-5. The complaint is clear that he was actually performing his operations to real property. That's what this entire grove was. You've seen a lot of cases in the briefs about J-5. We looked nationally for something that was factually on point, and the best case we could find was the Arroyo decision from the Ninth Circuit. You had a vineyard where the insured was responsible for fully developing the vineyard and then maintaining it. The Ninth Circuit affirmed on J-5, arguing it was clearly damage to real property while the insured was performing operations. So even if you got beyond the insuring agreement, there was going to be no coverage under the exclusion. For all these reasons, we'd ask the court to send the right message to litigants in Florida when it comes to Koblentz agreements. Find that it's collusive, unreasonable, as well as the fact that there was never any coverage here because there was no property damage, there was no occurrence, the expected or intended injury exclusion applies, as well as exclusion J-5 for damage to real property. Thank you. Thank you, counsel. Ms. Pottlelock, two minutes. Thank you, your honors. I'd actually like to pick up right where Brother Counsel left off with the Arroyo decision and just briefly address that that case is literally the mirror opposite of what we have here. So we have, in this case, an endorsement that modifies the insuring agreement and the scope of coverage to this specific risk and broadly does so. That case has no such endorsement, but in contrast, has a modified J-5 exclusion. So the standard J-5 exclusion applies to that particular part of real property on which you are performing operations. That J-5 exclusion in that specific case included in the J-5 exclusion reference to the vineyard operations that were being done. So of course they reached that conclusion. The exclusion was designed to take that out of play. Here, Traveler sold an endorsement that's specifically designed to give that coverage. That's not an indicative case of how this decision should be resolved. As to the balance of the issues that were just addressed, I think, you know, one correction of the record. So the characterization was made that somehow the negotiations over the resolution of the and somehow wound up at 2.9. That's absolutely not the case. That's completely out of sequence with what the record reflects. That an analysis was prepared by Kyle Story, who has a long history of providing agriculture services in Florida. He came in subsequent to McKenzie's firing, evaluated what was going on with the grove. This is after a year of discovery in this case, which started to draw out the fact that there were more issues than just some stealing of gas and some overbilling on trees. He actually had been mismanaging the entire grove and was causing extensive physical damage to the property, the irrigation, the drainage, to the trees. Let me ask you this, Mr. Powell. I suppose the insured comes in a covalence agreement and says in writing, I want to make clear that I don't know whether this amount that I'm agreeing to is reasonable or not. All I know is it's in my advantage to sign off on what the plaintiff wants. That's why I'm doing it. Is that in good faith? I would say that would be one element of the facts that would lead. Apologies, Your Honor. I see that I've overrun my time. No, no, no. Answer your question. Yeah, I think that would be one element of the totality of the facts that would have to be evaluated by a jury. How could that be? How could a jury find that was in good faith? I suppose it would depend on the full hypothetical, Your Honor. Because this is a case, if that were the situation in this case, which it is not, what I would tell you is that there is an extensive. Why is it that situation? He said he doesn't know whether that's the amount of damage or not. He's not agreeing. But he testified otherwise. In your scenario, sorry, so in your hypothetical, I would say that would likely to be a strong indication of bad faith, but it would have to be taken into account in the totality of the facts. It's not the situation here where McKenzie actively denied having responsibility for this, but recognized through his own analysis that there was a risk that a jury would decide otherwise. But I thought he included in the agreement that I don't know whether that's the amount of damages or not. What he says in the agreement is that no independent analysis that is beyond his own was conducted. Oh, so he said, I think personally, based on my own analysis, that's reasonable, but I don't have anybody else who's supporting me on that. At that stage, with no means to fund the defense and having a history in this field, he evaluated the assessment that was provided by his colleague and with the advice of his counsel, who knows what litigation looks like in South Florida, came to the conclusion that there was a risk that that number was going to be much higher. And the subsequent analysis bears that out, including the analysis that was performed by the accounting experts retained by Travelers. Thank you, counsel. Thank you. This, we'll go on to the third case then. Praetorian versus Collins and Penny.